Justice THOMAS, dissenting.
The Court holds that service on a foreign state by certified mail under the Foreign Sovereign Immunities Act (FSIA) is defective unless the packet is "addressed and dispatched to the foreign minister at the minister's office in the foreign state ." Ante , at ---- (emphasis added). This bright-line rule may be attractive from a policy perspective, but the FSIA neither specifies nor precludes the use of any particular address. Instead, the statute requires only that the packet be sent to a particular person-"the head of the ministry of foreign affairs." 28 U.S.C. § 1608(a)(3).
Given the unique role that embassies play in facilitating communications between states, a foreign state's embassy in Washington, D. C., is, absent an indication to the contrary, a place where a U.S. litigant can serve the state's foreign minister. Because there is no evidence in this case suggesting that Sudan's Embassy declined the service packet addressed to its foreign minister-as it was free to do-I would hold that respondents complied with the FSIA when they addressed and dispatched a service packet to Sudan's Minister of Foreign Affairs at Sudan's Embassy in Washington, D. C. Accordingly, I respectfully dissent.
I
To serve a foreign state by certified mail under the FSIA, the service packet must be "addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." Ibid . In many respects, I approach this statutory text in the same way as the Court. I have no quarrel with the majority's definitions of the relevant statutory terms, ante, at ---- - ----, and I agree that the FSIA does not deem a *1063 foreign state properly served solely because the service method is reasonably calculated to provide actual notice, ante, at ---- - ----, ---- - ----. Nor does the FSIA authorize service on a foreign state by utilizing an agent designated to receive process for the state. Ante, at ---- - ----. At the same time, the FSIA stops short of requiring that the foreign minister personally receive or sign for the service packet: As long as the service packet is "addressed and dispatched ... to" the foreign minister, § 1608(a)(3), the minister's subordinates may accept the packet and act appropriately on his behalf. Ante, at ----.
In short, I agree with the majority that § 1608(a)(3) requires that the service packet be dispatched to an address for the foreign minister. The relevant question, in my view, is whether a foreign state's embassy in the United States can serve as a place where the minister of foreign affairs may be reached by mail. Unlike the majority, I conclude that it can.
II
A foreign state's embassy in Washington, D. C., is generally a place where a U.S. court can communicate by mail with the state's foreign minister. Unless an embassy decides to decline packages containing judicial summonses-as it is free to do, both in individual cases or as a broader policy-a service packet addressed and dispatched to a foreign minister at the address of its embassy in the United States satisfies § 1608(a)(3).
Because embassies are "responsible for state-to-state relationships," Malone, The Modern Diplomatic Mission, in The Oxford Handbook of Modern Diplomacy 124 (A. Cooper, J. Heine, & R. Thakur eds. 2013), an important function of an embassy or other "diplomatic mission" is to "act as a permanent channel of communication between the sending state and the receiving state." G. Berridge & A. James, A Dictionary of Diplomacy 73 (2d ed. 2003). Embassies fulfill this function in numerous ways, including by using secure faxes, e-mails, or the "diplomatic bag" to transmit documents to the states they represent. A. Aust, Handbook of International Law 122 (2d ed. 2010); see ibid. (the diplomatic bag is a mailbag or freight container containing diplomatic documents or articles intended for official use). Thus, as one amicus brief aptly puts it, embassies "have direct lines of communications with the home country, and a pipeline to route communications to the proper offices and officials." Brief for Former U.S. Counterterrorism Officials et al. as Amici Curiae 29.
Numerous provisions of the Vienna Convention on Diplomatic Relations (VCDR) confirm this reality, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502. Under the VCDR, an embassy "may employ all appropriate means" of communicating with the state whose interests it represents, Art. 27(1), including "modern means of communication such as (mobile) telecommunication, fax, and email," Wouters, Duquet, & Meuwissen, The Vienna Conventions on Diplomatic and Consular Relations, in The Oxford Handbook of Modern Diplomacy, supra , at 523. The VCDR provides substantial protections for the "official correspondence of the mission" and the diplomatic bag, which may include "diplomatic documents or articles intended for official use." Arts. 27(1)-(5); cf. Vienna Convention on Consular Relations, Arts. 3, 5(j), 35, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (recognizing that embassies may perform "[c]onsular functions," such as "transmitting judicial and extrajudicial documents," and affording protections to official communications).
The capability of an embassy to route service papers to the sending state is confirmed by the State Department regulation *1064 implementing § 1608(a)(4), which provides for service on the foreign state through diplomatic channels. Under this regulation, the Department may deliver the service packet "to the embassy of the foreign state in the District of Columbia" "[i]f the foreign state so requests or if otherwise appropriate." 22 CFR § 93.1(c)(2) (2018). Although the service packet under § 1608(a)(4) need not be addressed and dispatched to the foreign minister, the regulation implementing it nevertheless demonstrates that embassies do in fact provide a channel of communication between the United States and foreign countries.
It was against this backdrop that respondents requested that their service packet be "addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of [Sudan]," § 1608(a)(3), at the address of its embassy in Washington, D. C. Because an embassy serves as a channel through which the U.S. Government can communicate with the sending state's minister of foreign affairs, this method of service complied with the ordinary meaning of § 1608(a)(3) on this record. There is-and this is critical-no evidence in the record showing that Sudan's foreign minister could not be reached through the embassy. As the majority acknowledges, the clerk received a signed return receipt and a shipping confirmation stating that the package had been delivered. Ante, at ----. Nothing on the receipt or confirmation indicated that the package could not be delivered to its addressee, and both the clerk and the District Judge determined that service had been properly effectuated.
Of course, the FSIA does not impose a substantive obligation on the embassy to accept or transmit service of process directed to the attention of the foreign minister. A foreign state and its embassy are free to reject some or all packets addressed to the attention of the foreign minister. But, as detailed above, Sudan has pointed to nothing in the record suggesting that its embassy refused service, or that its embassy address was not a place at which its foreign minister could be reached. On these facts, I would hold that the service packet was properly "addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs." § 1608(a)(3).
III
A
Instead of focusing on whether service at an embassy satisfies the FSIA, the Court articulates a bright-line rule: To comply with § 1608(a)(3), "[a] service packet must be addressed and dispatched to the foreign minister at the minister's office in the foreign state ." Ante, at ---- (emphasis added). Whatever virtues this rule possesses, the Court's interpretation is not the "most natural reading" of § 1608(a)(3), ante, at ----.
The Court focuses on the foreign minister's "customary office" or "place of work," ante, at ----, ----, but these terms appear nowhere in § 1608. The FSIA requires that the service packet be "addressed and dispatched" to a particular person -"the head of the ministry of foreign affairs." § 1608(a)(3). It does not further require that the package be addressed and dispatched to any particular place . While I agree with the Court that sending the service packet to the foreign ministry is one way to satisfy § 1608(a)(3), that is different from saying that § 1608(a)(3) requires service exclusively at that location.
The absence of a textual foundation for the majority's rule is only accentuated when § 1608(a)(3) is compared to § 1608(a)(4), the adjacent paragraph governing service through diplomatic channels.
*1065 Under that provision, the service packet must be "addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia , to the attention of the Director of Special Consular Services." § 1608(a)(4) (emphasis added); see 22 CFR § 93.1(c) (State Department regulation governing service under this provision). Unlike § 1608(a)(3), this provision specifies both the person to be served and the location of service. While not dispositive, the absence of a similar limitation in § 1608(a)(3) undermines the categorical rule adopted by the Court.
The Court offers three additional arguments in support of its position, but none justifies its bright-line rule.
First, the Court offers a series of hypotheticals to suggest that the term "dispatched" not only contemplates a prompt shipment, but also connotes sending the letter directly to a place where the person is likely to be physically located. Ante, at ---- - ----. In my opinion, these hypotheticals are inapt. The unique role of an embassy in facilitating communications between sovereign governments does not have an analog in the hypotheticals offered by the majority.[1] And to the extent the statute emphasizes speed and directness, as the majority suggests, dispatching a letter to a Washington-based embassy with a direct line of communication to the foreign minister-including the ability to communicate electronically-seems at least as efficient as dispatching the letter across the globe to a foreign country, particularly if that country has recently experienced armed conflict or political instability.
Second, the Court notes that, under its rule, the effective date of service under § 1608(c) will be closer in time to when the service packet reaches a foreign official who knows how to respond to the summons. Ante , at ---- - ----. That contention assumes embassy employees are less capable of responding to a summons than foreign-ministry employees. But even granting that premise, this argument falls short. An embassy is capable of quickly transmitting a summons to the foreign minister, whether electronically, by diplomatic bag, or by some other means. Any time lost in transmission is not significant enough to warrant the Court's departure from the text of the statute.
Third, the Court argues that allowing service at the embassy would make it easier to serve a foreign state than it is to serve a person in that foreign state under Federal Rule of Civil Procedure 4. Ante, at ---- - ----. I am not persuaded. Under the FSIA, service by mail is not effective until "the date of receipt indicated in the ... signed and returned postal receipt." § 1608(c)(2). That is no more generous than practice under Rule 4, especially since the foreign minister need not accept service. To the extent that embassies accept service of process directed to the foreign minister, it is that decision that eases the burden on the plaintiff, not § 1608(a)(3).
B
Sudan also argues that allowing service by mail at an embassy would violate Article *1066 22(1) of the VCDR. The Court does not adopt Sudan's argument, stating only that its decision has "the virtue of avoiding potential tension" with the VCDR. Ante, at 1060. But there is no tension between my reading of the FSIA and the VCDR.[2]
Article 22(1) of the VCDR provides that the premises of the mission-that is, "the buildings or parts of buildings and the land ancillary thereto ... used for the purposes of the mission," Art. 1(i)-"shall be inviolable." The VCDR consistently uses the word "inviolable" to protect against physical intrusions and similar types of interference, not the jurisdiction of a court. The concept of "inviolability" is used, for instance, to protect the mission's "premises," Art. 22(1); the "archives and documents of the mission," Art. 24; the "official correspondence of the mission," Art. 27(2); the "private residence of a diplomatic agent," Art. 30(1); and the diplomatic agent's "person," "papers, correspondence, and," with certain exceptions, "his property," Arts. 29, 30(2).
The provisions of the VCDR that protect against assertions of jurisdiction, by contrast, speak in terms of "immunity." Thus, in addition to physical inviolability, the premises of the mission (and "other property thereon") are separately "immune from search, requisition, attachment or execution." Art. 22(3). And a diplomatic agent is separately "immun[e] from the criminal jurisdiction of the receiving State" and, generally, from "its civil and administrative jurisdiction." Art. 31(1). Several provisions of the VCDR distinguish between "immunity from jurisdiction, and inviolability." Art. 38(1); see Arts. 31(1), (3).
Given the VCDR's consistent use of "inviolability" to protect against physical intrusions and interference, and "immunity" to protect against judicial authority, Article 22(1)'s protection of the mission premises is best understood as a protection against the former. Thus, under the VCDR, the inviolability of the embassy's premises is not implicated by receipt of service papers to any greater degree than it is by receipt of other mail. Cf. Reyes v. Al-Malki , [2017] UKSC 61, ¶16 (holding that service via mail at the diplomatic residence-which is afforded the same level of protection as the mission premises under Article 30(1)-does not violate the VCDR).
* * *
Because the method of service employed by respondents here complied with the FSIA, I would affirm the judgment of the Second Circuit.

To the extent the relationship between a U.S. Attorney's office and the Attorney General is analogous, the majority correctly acknowledges that the office would "very probably forward" a letter directed to the attention of the Attorney General. Ante , at ----. The majority nevertheless believes that it would be improper or unusual to dispatch that letter to a local U.S. Attorney's office. I disagree. It seems entirely likely that a person residing in the District of Idaho would dispatch a letter to the Attorney General through the U.S. Attorney's office serving his District-even if it would be odd for a resident of the District of Columbia to use that Idaho address.

Even if there were, the FSIA postdates the VCDR and thus " 'renders the treaty null' " " 'to the extent of conflict.' " Breard v. Greene , 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (per curiam ) (quoting Reid v. Covert , 354 U.S. 1, 18, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion)).